**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x

JENNA HOFFMANN,

      Plaintiff,                         **COMPLAINT**

      -against-                     Case No. 1:24-cv-05910

MARY GIULIANI CATERING & EVENTS, INC.,      Jury Trial Demanded
MARY GIULIANI, LLC, and
MARY GIULIANI,

      Defendants.

-----------------------------------------------------------------x

      Plaintiff Jenna Hoffmann, by and through counsel, as and for her Complaint against Defendants Mary Giuliani Catering & Events, Inc., Mary Giuliani, LLC, and Mary Giuliani alleges as follows, on personal knowledge as to her own acts and observations and on information and belief as to all other matters.

## PARTIES

      1.      Ms. Hoffmann is a resident of California and currently resides in Los Angeles, California.

      2.      Upon information and belief, Mary Giuliani Catering & Events, Inc. ("MGCE") is a New York domestic corporation with its principal place of business located at 18 West 21st Street, Room 202, New York, NY 10010.

      3.      MGCE is a business that provides event planning and catering services.

      4.      At all times relevant herein, MGCE is and was an employer engaged in industry affecting commerce within the ambit of Section 1981 and an employer within the meaning of the NYSHRL, N.Y. Exec. L. § 296(5), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

1

5.      Upon information and belief, Mary Giuliani, LLC is a New York domestic company with its principal place of business located at 18 West 21st Street, Room 202, New York, NY 10010.

6.      At all times relevant herein, Mary Giuliani, LLC is and was an employer engaged in industry affecting commerce within the ambit of Section 1981, and an employer within the meaning of the NYSHRL, N.Y. Exec. L. § 296(5), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

7.      Upon information and belief, Ms. Giuliani is a resident of the State of New York and currently resides in New York City, New York.

8.      At all times relevant herein, Ms. Giuliani is and was an employer, and/or aided and abetted discrimination, within the meaning of the NYSHRL, N.Y. Exec. L. § 296(1), and the NYCHRL, N.Y.C. Admin. Code § 8-102.


## JURISDICTION AND VENUE

9.      This Court has original subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1332 and 1343.  There is complete diversity of citizenship between the Plaintiff (who is a California citizen) and Defendants (who are New York citizens), and the amount in controversy, excluding interests in costs, exceeds $75,000.  In addition, this action raises claims under a federal civil rights statute, 42 U.S.C. § 1981, and the city and state law claims are so related to Plaintiff's federal claims that they form part of the same case or controversy under Article III of the United States Constitution.  See 28 U.S.C. § 1367.

10.      This Court has personal jurisdiction over the Defendants as the acts and events giving rise to this case occurred in New York, New York.

11.     Venue is proper in the Southern District of New York as the acts and events giving rise to this case occurred in the Southern District of New York.

## STATEMENT OF FACTS

### I.     Background

12.     Ms. Hoffmann is a creative professional with almost 12 years of experience directing theater productions. She has directed and produced dozens of plays, musicals, and other productions, and she has assisted on countless others. Through her theatrical work, Ms. Hoffmann loves to bring people together and find joy in collective experience.

13.     Ms. Hoffmann graduated from New York University with a Bachelor's Degree in Drama, specializing in Theater Directing and Playwriting, and is currently pursuing a Masters Degree in Business Administration at the University of Illinois Urbana-Champaign so she can apply her passion for creativity and bringing people together in other ways.

14.     Ms. Hoffmann first met Mary Giuliani, the owner and founder of MGCE, through a women's networking group. A family friend of Ms. Hoffmann's sent Ms. Hoffmann's resume to the networking group in the spring of 2021.

15.     Impressed by Ms. Hoffmann's resume, Ms. Giuliani reached out to her. Ms. Giuliani praised her creative portfolio and experience, and even told Ms. Hoffmann that she thought her resume was "fake" because it was so impressive.

16.     Ms. Giuliani told Ms. Hoffmann that she wanted her to be a leader in her company, MGCE, which caters, produces, and plans private and public events for its celebrity clientele, including Fendi, Condé Nast, Google, People Magazine, MTV, Netflix, Jimmy Fallon and many other high profile people and entities.

17.    Ms. Giuliani encouraged Ms. Hoffmann to apply to MGCE as an Event Producer, emphasizing that she could move up in the company and eventually become its Creative Director.

18.    At the time, Ms. Hoffmann was working as a freelance director and producer. Due to the COVID-19 pandemic's impact on the industry, she was eager for full-time employment, so she agreed to apply for the role.

19.    On June 8, 2021, Ms. Giuliani and MGCE President Michele Pokowicz interviewed Ms. Hoffmann in person. During the interview, Ms. Giuliani and Ms. Pokowicz talked at length about the exciting opportunities Ms. Hoffmann would eventually have as the Creative Director.

20.    Ms. Hoffmann met with Ms. Pokowicz and Senior Vice President Ryan Brown for a second interview via Zoom on June 11, 2021.

21.    During this second interview, Ms. Giuliani, Ms. Pokowicz and Mr. Brown assured Ms. Hoffmann that she could work remotely, aside from when she led events, and that she could bring her dog to the office when she did work in person.

22.    MGCE then offered Ms. Hoffmann the Event Producer position, which she accepted. Ms. Giuliani told Ms. Hoffman that she would be reporting directly to her (Ms. Giuliani).

## II.    <u>Start of Employment</u>

23.    On June 14, 2021, Ms. Hoffmann started working at MGCE.

24.    Upon her arrival, Ms. Pokowicz informed Ms. Hoffman that she would actually be reporting to her (Ms. Pokowicz) rather than Ms. Giuliani. Director of Events Ilana Schackman then told Ms.  Giuliani  that in fact she would be reporting to *her* (Ms. Schackman) and not to Ms. Pokowicz.

4

25.    Ms. Pokowicz, Director of Production Chris Sloan, and Director of Events Ilana Schackman then told Ms. Hoffmann that she needed to report to the office in-person everyday, despite what she had been promised during the interview process. They also said that she could not bring her dog to the office, and openly mocked her for thinking otherwise.

26.    MGCE also gave Ms. Hoffmann a poor-quality, refurbished computer that crashed regularly and was inadequate to run the many programs required for her job. It repeatedly deleted her work on the Adobe Creative Cloud and failed to save her work in Photoshop, Illustrator, InDesign, and other programs. Ms. Hoffmann promptly told Mr. Brown, Ms. Pokowicz and Ms. Schackman about the issues with her computer, but they took no action until late June, when it crashed again, causing Ms. Hoffmann to lose an important budget document.

27.    On July 19, 2021, Mr. Brown sent Ms. Hoffmann another refurbished computer, but it came with a previous username and password that prevented Ms. Hoffmann from logging into it.

28.    On July 28, 2019, MGCE issued Ms. Hoffmann a third refurbished computer, but this third computer would not even turn on. MCGE instructed Ms. Hoffmann to use her personal computer until they could find a suitable replacement.

29.    Ms. Hoffmann poured her creativity and passion into the role of Event Producer, with immediate success. During her first week, she referred in a new client and successfully produced a Tribeca Film Festival event along with Ms. Pokowicz and Creative Coordinator Emily Racaniello.

30.    After the Tribeca Film Festival event, Ms. Hoffman began producing events on her own. During her first month at MGCE, she successfully produced events for Infiniti, iHeartRadio, Stella Artois, Jimmy Fallon and NGK Global, among others. Ms. Giuliani

consistently praised Ms. Hoffmann for her work on these events and told her that she was going "above and beyond" in her job performance.

31.    Ms. Giuliani, Ms. Pokowicz  and Ms. Schackman all commended Ms. Hoffmann for her hard work and quick adaptation to the company.

32.    Because of the numerous events on MGCE's schedule, Ms. Hoffmann consistently worked 12-16 hour days. MGCE also expected Ms. Hoffmann to answer her emails on weekends and to work all weekend events.

33.    As a result, Ms. Hoffmann consistently worked between 60-100 hours per week.

34.    On one occasion, when Ms. Hoffman produced a 12-hour restaurant pop-up event, she did not finish her work until after 2:00 AM, so she called an Uber to take her home safely and attempted to expense it, as Ms. Pokowicz had previously invited her to do. However, following this event, Ms. Schackman told Ms. Hoffmann that she was not allowed to expense any Ubers in the future, no matter how late she finished working on events.

35.    Ms. Hoffmann's actual job responsibilities far exceeded those outlined in the job description for the Event Producer role. In addition to producing events, she was treated as the office errand-girl as MCGE – and Mr. Sloan, in particular – required her to chauffeur wait and kitchen staff to and from events, purchase ingredients for the chefs, drop off and pick up dry cleaning, tidy the office, and perform many other menial tasks.

36.    In one instance, a client specifically requested, and paid for, William Greenberg Desserts's signature Black and White Cookies. When Mr. Sloan forgot to place an order with William Greenberg in  time for the event, he instructed Ms. Hoffmann to run to Trader Joe's, buy black and white cookies from there and pass them off as William Greenberg's signature cookies at the event.

37.    While MGCE told Ms. Hoffmann that she would be reporting directly to Ms. Giuliani, MGCE treated Ms. Hoffmann as a personal assistant to everyone in the office.

38.    These additional tasks prevented Ms. Hoffmann from focusing on her own responsibilities as Event Producer.

### III.    Racial Slurs and Antisemitic Comments

39.    Mr. Sloan also repeatedly made racist and anti-semitic comments in the workplace.

40.    Mr. Sloan and all other employees working in-office were White.

41.    On several occasions, Mr. Sloan used the N-word in the workplace and made other bigoted remarks about Black people.

42.    The such first instance that Ms. Hoffmann recalls was during her third week of employment in early July, 2021. Mr. Sloan, Ms. Schackman, Ms. Pokowicz, and others were sitting and talking in MGCE's open-layout office when Mr. Sloan expressed disapproval about the protests that were happening in response to the murders of George Floyd, Ahmaud Arbery, and others. Mr. Sloan referred to these protests as riots and called the protesters "N***ers."

43.    Ms. Hoffmann froze in shock and her jaw dropped, but Ms. Pokowicz, Ms. Schackman, and the others just laughed.

44.    In a separate incident in July 2021, while talking about clients of different ethnic backgrounds, Mr. Sloan called Asian people "the squinty-eyes." Again, Ms. Hoffmann froze while everyone else laughed at Mr. Sloan's racist remark.

45.    Mr. Sloan also frequently made anti-semitic comments, referring to Jews as "the big-noses." In July, 2021, Mr. Sloan announced in the workplace:  "All the Jews need to march back to the gas chamber."

46.     Ms. Hoffmann was living with a Jewish man to whom she is now married. Defendants knew she was living with her now-husband. She also has a last name that is frequently Jewish and has physical features that are often associated with Jewish ancestry. As such, she is often mistaken for a Jewish woman, which made her wonder if these remarks were targeted at her.

47.     Regardless, Ms. Hoffmann was appalled by Mr. Sloan's remarks. She froze and looked around the room while Ms. Shackman laughed, tacitly encouraging Mr. Sloan to continue his vile comments.

48.     Ms. Hoffmann was so upset after this incident that she had to take a prescription Valium to calm herself.

49.     In another instance in July 2021, as MCGE was considering hiring an additional Event Producer, the company interviewed a Black woman for the role. After the interviewee left, Mr. Sloan called her a "n***er" and other racial slurs. Ms. Pokowicz laughed at these remarks.

50.     Mr. Sloan's racist and antisemitic comments caused Ms. Hoffmann extreme anxiety and emotional distress. Starting in mid-July 2021, shortly after Mr. Sloan began making bigoted comments, Ms. Hoffmann increased her therapy sessions from biweekly to weekly.

51.     Around this time, Ms. Hoffmann's psychiatrist also increased Ms. Hoffmann's Valium prescription.

52.     Ms. Hoffmann also suffers from Trigeminal Neuralgia ("TN"), a rare neurological condition that causes severe, chronic pain around one's face. TN causes sharp, electric shock-like pain that can last for several minutes at a time. Ms. Hoffmann's TN is triggered particularly by stress and anxiety.

53.     Mr. Sloan's racist and antisemitic comments exacerbated Ms. Hoffmann's TN, causing her consistent bouts of extreme pain throughout the day. In July 2021, Ms. Hoffmann therefore started weekly sessions with a pain management specialist.

54.     On July 28, 2021, Ms. Hoffmann met with Ms. Pokowicz and Ms. Schackman to talk about a budget that her previous computer had failed to save. Ms. Pokowicz and Ms. Schackman blamed Ms. Hoffmann for losing the budget document, despite knowing that the faulty computers they had issued her had caused her to lose the work.

55.     Ms. Pokowicz and Ms. Schackman also vaguely accused Ms. Hoffmann of "not doing enough for the company." When Ms. Hoffmann asked them what they meant by this, Ms. Pokowicz and Ms. Schackman refused to answer her and simply referred again to the lost budget.

56.     Ms. Hoffmann asked them if there was an employee handbook she could review to get a better understanding of their expectations, and they referred her to SVP Ryan Brown, who handled MGCE's HR concerns.

57.     Ms. Hoffman wanted to raise the issue of Mr. Sloan's racist and antisemitic comments in this meeting, but she did not feel she could do so, as Ms. Pokowicz and Ms. Schackman had laughed at his remarks and were clearly amused by them.

58.     Instead, Ms. Hoffmann explained that Mr. Sloan routinely assigned her menial tasks such as tidying the office and fetching the dry cleaning, which was not a part of her job description and diverted her from her core event production responsibilities. In response, Ms. Pokowicz and Ms. Schackman stated that MGCE operated "like a pyramid scheme" and that Ms. Hoffmann would be doing all the "bitch work" until she brought in enough clients to justify a new hire to take over all the so-called "bitch work" from her.

59.     Frustrated, confused and deeply distressed, Ms. Hoffmann started crying. Ms. Pokowicz and Ms. Schackman told her they didn't "have time for *this*" and ordered her to "get out!"

60.     After being kicked out of the meeting, Ms. Hoffmann emailed Mr. Brown to request a copy of the employee handbook.

61.     By reply email, Mr. Brown stated that MGCE did not have an employee handbook, and that there wasn't any policy that outlined office hours or other job expectations.

62.     The next day, on July 29, 2021, Mr. Sloan again said "gas the big-noses" in the workplace.

**IV.     Protected Activity**

63.     Fed up with Mr. Sloan's vile racism and antisemitism, Ms. Hoffmann immediately walked outside of the office and called Mr. Brown.

64.     Ms. Hoffmann informed Mr. Brown that she had heard some very inappropriate comments in the workplace, and asked if the company had any reporting process for this type of situation.

65.     Mr. Brown simply said there was no written policy about reporting inappropriate workplace comments, and left it at that. He did not ask Ms. Hoffmann a single question about the inappropriate comments, their substance, or who was making them.

66.     Not knowing where else to turn, Ms. Hoffmann scheduled a phone meeting with Ms. Giuliani to report the ongoing racist and antisemitic comments.

67.     On August 3, Ms. Hoffmann met with Ms. Giuliani over the phone. When Ms. Hoffmann told Ms. Giuliani, in detail, about the racist and antisemitic comments, Ms. Giuliani immediately asked: "Was it Chris [Sloan]?"

68.    When Ms. Hoffmann confirmed that it was indeed Mr. Sloan who had made these comments, Ms. Giuliani breezily dismissed and downplayed the hateful comments by saying: "Oh, that's just Chris." She then casually added that she would "talk to Ryan [Brown]" about Mr. Sloan's bigoted workplace comments.

69.    Ms. Hoffmann also told Ms. Giuliani that Ms. Pokowicz and Ms. Schackman said MGCE was like a "pyramid scheme." In response, Ms. Giuliani laughed, but declined to comment.

70.    Ms. Hoffmann told Ms. Giuliani about the anxiety and emotional distress that Mr. Sloan's comments, as well as MGCE's lack of professionalism and unclear work expectations, were causing her.

71.    Ms. Giuliani then professed concern for Ms. Hoffmann's health, telling her to take two weeks of paid vacation "on us" to rest and recover. Ms. Giuliani also pointedly told Ms. Hoffmann that she had been doing a fantastic job and that she needed and deserved a break from all her hard work.

72.    Ms. Hoffmann agreed to take two weeks of paid leave.

## V.    **Retaliation**

73.    The next day, on August 4, 2021, MGCE terminated Ms. Hoffmann's employment, effective immediately.

74.    In a termination letter signed by Mr. Brown, MGCE partly attributed her termination to her August 3 complaint about racist and antisemitic comments in the workplace.

75.    The termination letter also falsely accused Ms. Hoffmann of refusing to report these bigoted comments to "the human resources department." In addition to being false, this accusation was absurd in that MCGE did not have a human resources department, nor any

employee handbook or policy manual to provide guidance on these matters – as Mr. Brown himself had explained to Ms. Hoffman in his July 28 email and during their July 29 phone call.

76.     The termination letter also falsely accused Ms. Hoffmann of unsatisfactory performance and breaking "established protocols." However, MGCE never gave Ms. Hoffmann any protocols and never provided her with an employee handbook, despite her request. Further, the only negative feedback Ms. Hoffmann had ever received about her performance was with regard to the budget her faulty computer had failed to save. One day prior to her termination, Ms. Giuliani had told her she was doing an excellent job.

77.     The termination letter also stated that Ms. Hoffmann had committed a "flagrant violation" by using images from two MCGE events on her personal website and misrepresenting them as her own work. However, Ms. Hoffman had taken these pictures for MCGE's social media at the company's request, and then asked Ms. Pokowicz, Mr. Brown and Ms. Schackman if she could also post the photos to her professional website and her personal social media account. Ms. Pokowicz, Mr. Brown, and Ms. Schackman had all said yes.

78.     The letter stated that MCGE had suddenly "discovered" this "violation" directly after Ms. Hoffmann had reported Mr. Sloan's bigoted comments to Ms. Giuliani.

79.     In sum, the contents of the termination letter, along with its timing, made it painfully clear that Ms. Hoffmann had actually been fired in retaliation for her complaint about Mr. Sloan's racist and antisemitic comments.

80.     Defendants retaliated against and terminated Ms. Hoffmann willfully, intentionally, maliciously, and because Ms. Hoffmann was engaged in a protected activity and was exercising protected rights.

81.     Since her termination, despite diligent efforts, Ms. Hoffmann has been unable to secure full-time employment.

82.     As a result of Defendants' unlawful conduct, Ms. Hoffmann has suffered loss of income, benefits, and other perquisites of employment, including continuing opportunities for promotion, advancement, recognition and increased compensation.

83.     Defendants' unlawful conduct has also caused Ms. Hoffmann substantial emotional distress with painful physical manifestations.

84.     Ms. Hoffmann reserves the right to amend this action to raise any appropriate cause of action with relation back to the date of filing.

**FIRST CAUSE OF ACTION**
**Violation of 42 U.S.C. § 1981**
**Retaliation**

85.     Ms. Hoffmann incorporates each and every allegation of this Complaint as if fully set forth here.

86.     Ms. Hoffmann engaged in activity protected by 42 U.S.C. § 1981, including but not necessarily limited to speaking out against MGCE employees' racist comments about Black, Jewish, and Asian people.

87.     Defendants took adverse action against Ms. Hoffmann because of her protected activity in a manner that indicates a but-for causal connection. Among other things, MGCE retaliated by terminating her employment the day after she made her protected complaint.

88.     As a direct and proximate result of Defendants' unlawful actions, Ms. Hoffmann has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain with physical

manifestations, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

89.    Defendants' actions were intentional, willful, wanton, malicious, and / or reflect a reckless disregard of Ms. Hoffmann's rights, justifying punitive damages.

90.    Ms. Hoffmann prays that the Court find Defendants liable for retaliation in violation of 42 U.S.C. § 1981, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

**SECOND CAUSE OF ACTION**
**Violation of the New York State Human Rights Law**
**N.Y. Exec. Law 290 et seq.**
**Retaliation**

91.    Ms. Hoffmann repeats and realleges each and every allegation of this Complaint as if set forth herein.

92.    Ms. Hoffmann engaged in activity protected by the New York City Human Rights Law, including but not necessarily limited to speaking out against MGCE employees' racist comments about Black, Jewish, and Asian people.

93.    Defendants took adverse action against Ms. Hoffmann because of her protected activity. Among other things, MGCE retaliated against Ms. Hoffman by terminating her employment the day after she made her protected complaint.

94.    Ms. Hoffmann's protected activity was a motivating or other causally-sufficient factor in Defendants' actions.

95.    As a direct and proximate result of Defendants' unlawful actions, Ms. Hoffmann has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain with physical

manifestations, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

96.    Defendants' actions were intentional, willful, wanton, malicious, and / or reflect a reckless disregard of Ms. Hoffmann's rights, justifying punitive damages.

97.    Ms. Hoffmann prays that this Court find Defendants liable for retaliation in violation of the New York State Human Rights Law, and grant all relief permitted by law, as set forth in the Prayer to this Complaint.

### THIRD CAUSE OF ACTION
**Violation of the New York City Human Rights Law**
**N.Y.C. Admin. Code 8-101 et seq.**
**Retaliation**

98.    Ms. Hoffmann repeats and realleges each and every allegation of this Complaint as if set forth herein.

99.    Ms. Hoffmann engaged in activity protected by the New York City Human Rights Law, including but not necessarily limited to speaking out against MGCE employees' racist comments about Black, Jewish, and Asian people.

100.    Defendants took adverse action against Ms. Hoffmann because of her protected activity. Among other things, MGCE retaliated against Ms. Hoffmann by terminating her employment.

101.    Ms. Hoffmann's protected activity was a motivating or other causally-sufficient factor in Defendants' actions.

102.    As a direct and proximate result of Defendants' unlawful actions, Ms. Hoffmann has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain with physcial

manifestations, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

103.    Defendants' actions were intentional, willful, wanton, malicious, and / or reflect a reckless disregard of Ms. Hoffmann's rights, justifying punitive damages.

104.    Ms. Hoffmann prays that this Court find Defendants liable for retaliation in violation of the New York City Human Rights Law, and grant all relief permitted by law, as set forth in the Prayer to this Complaint.

## FOURTH CAUSE OF ACTION
### Violation of 42 U.S.C. § 1981
### Discrimination

105.    Ms. Hoffmann incorporates each and every allegation of this Complaint as if fully set forth here.

106.    Ms. Hoffmann was associated with Jewish persons and also was perceived as Jewish.

107.    Defendants subjected Ms. Hoffmann to differential terms and conditions of employment, harassed her, subjected her to a hostile environment, and terminated her.

108.    There was a but-for causal connection between Ms. Hoffmann's protected status and Defendants' actions.

109.    As a direct and proximate result of Defendants' unlawful actions, Ms. Hoffmann has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain with physical manifestations, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

110.    Defendants' actions were intentional, willful, wanton, malicious, and / or reflect a reckless disregard of Ms. Hoffmann's rights, justifying punitive damages.

111.    Ms. Hoffmann prays that the Court find Defendants liable for discrimination in violation of 42 U.S.C. § 1981, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

**FIFTH CAUSE OF ACTION**
**Violation of the New York State Human Rights Law**
**N.Y. Exec. Law 290 et seq.**
**Discrimination**

112.    Ms. Hoffmann incorporates each and every allegation of this Complaint as if fully set forth here.

113.    Ms. Hoffmann was associated with Jewish persons and also was perceived as Jewish.

114.    In addition, Ms. Hoffman lived with one or more conditions that qualify as disabilities: Anxiety and Trigeminal Neuralgia (TN).

115.    Defendants subjected Ms. Hoffmann to differential terms and conditions of employment, harassed her, subjected her to a hostile environment, and terminated her.

116.    Ms. Hoffmann's protected status(es) were motivating factor(s) or other sufficient causal factor(s) in Defendants' actions.

117.    As a direct and proximate result of Defendants' unlawful actions, Ms. Hoffmann has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain with physical manifestations, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

118.    Defendants' actions were intentional, willful, wanton, malicious, and / or reflect a reckless disregard of Ms. Hoffmann's rights, justifying punitive damages.

119.    Ms. Hoffmann prays that the Court find Defendants liable for discrimination in violation of the NYSHRL, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

**SIXTH CAUSE OF ACTION**
**Violation of the New York City Human Rights Law**
**N.Y.C. Admin. Code 8-101 et seq.**
**Discrimination**

120.    Ms. Hoffmann incorporates each and every allegation of this Complaint as if fully set forth here.

121.    Ms. Hoffmann was associated with Jewish persons and also was perceived as Jewish.

122.    In addition, Ms. Hoffman lived with one or more conditions that qualify as disabilities: Anxiety and Trigeminal Neuralgia (TN).

123.    Defendants subjected Ms. Hoffmann to differential terms and conditions of employment, harassed her, subjected her to a hostile environment, and terminated her.

124.    Ms. Hoffmann's protected status(es) were motivating factor(s) or other sufficient causal factor(s) in Defendants' actions.

125.    As a direct and proximate result of Defendants' unlawful actions, Ms. Hoffmann has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain with physical manifestations, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

126.    Defendants' actions were intentional, willful, wanton, malicious, and / or reflect a reckless disregard of Ms. Hoffmann's rights, justifying punitive damages.

127.    Ms. Hoffmann prays that the Court find Defendants liable for discrimination in violation of the NYCHRL, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

**SEVENTH CAUSE OF ACTION**
**Violation of the New York Labor Law**
**Unpaid Overtime Wages**

128.    Ms. Hoffmann incorporates each and every allegation of this Complaint as if fully set forth here.

129.    The New York Labor Law provides for premium pay at a rate of one and one-half times the base rate of pay for all hours worked over forty in a given week. See N.Y. Labor Law ("NYLL") §§ 2, 651, 663(1); N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2.

130.    Defendants were employers within the meaning of the New York Labor Law.

131.    Ms. Hoffmann was an employee within the meaning of the New York Labor Law.

132.    Defendants suffered and/or permitted Ms. Hoffmann to perform work to their benefit in excess of forty (40) hours per week.

133.    Defendants had knowledge of her work hours because, among other sources of knowledge, Ms. Hoffmann was present in the office, responding to messages, and at events with colleagues.

134.    Defendants accepted and retained the benefit of her work.

135.    Defendants failed to compensate Ms. Hoffmann for all time worked in excess of forty hours per week at a rate of one and one-half times the regular rate at which Ms. Hoffmann was employed.

136.    Defendants' actions were willful as they were aware of the duty to pay overtime and did not do so.

137.    Without assuming any burden of proof on any purported exemptions, Ms. Hoffmann's work did not come within any proper overtime exemption.

138.    As a result of Defendants' violations of the New York Labor Law, Ms. Hoffmann has suffered damages by being denied overtime wages in accordance with the NYLL, and is entitled to recovery of all such amounts, as well as liquidated damages, pre-judgment interest, post-judgment interest, attorneys' fees, costs, and other compensation, pursuant to N.Y. Labor Law §§ 2, 651, 663, and N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2.

139.    Ms. Hoffmann prays that this Court find Defendants liable for violation of the New York Labor Law, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

## JURY DEMAND

140.    Ms. Hoffmann respectfully demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

Ms. Hoffmann respectfully requests that this Court grant judgment for her and order the following relief against Defendants:

(1)    A declaratory judgment that the acts, policies, practices, and procedures complained of herein violated Ms. Hoffmann's rights as secured by Section 1981, the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq., and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq.;

(2)    Reinstatement to the highest position to which Ms. Hoffmann was and would be entitled and/or front pay;

(3)    Compensatory damages in the form of:

    (a)    back pay with interest based on Ms. Hoffmann's appropriate compensation had she not been wrongfully terminated;

    (b)    unpaid overtime wages;

    (c)    reimbursement for social security, experience, training opportunities, and other benefits, in an amount to be proved at trial; and

    (d)    damages for emotional pain and suffering, inconvenience, mental anguish, humiliation, and loss of reputation in an amount to be proved at trial;

    (e)    damages for future economic loss;

(4)    Liquidated damages and penalties;

(5)    Punitive damages;

(6)    Statutory attorneys' fees, expert fees, costs, and disbursements;

(7)    Interest; and

(8)    Such other and/or further relief as the Court deems just and proper.


Dated:  August 2, 2024                    Respectfully submitted,
        New York, NY

                                    KEENAN & BHATIA, LLC

                                      */s/ Chloe Liederman and E.E. Keenan*

                                  Chloe Liederman
                                  Edward (E.E.) Keenan

                                  233 Broadway, Suite 1810
                                  New York, NY 10279
                                  Tel: (212) 470-2560
                                  chloe@keenanfirm.com
                                  ee@keenanfirm.com

                                  *Attorneys for Plaintiff Jenna Hoffmann*